## HILLERICH & BRADSBY CO.

v.

## PARKER et al.

Court of Appeals of Kentucky.

April 30, 1954.

Peter, Heyburn & Marshall, Gavin H. Cochran, Louisville, for appellant.

W. C. Edrington, Louisville, for appellees.

COMBS, Justice.

The Workmen's Compensation Board, one member dissenting, dismissed appellee's application for compensation on the ground that she had not sustained an injury by accident within the meaning of the Act. The chancellor set aside the Board's order and directed that the case be remanded to the Board for the entry of an appropriate award. The employer has appealed.

Appellee's disability is the result of a ganglion cyst on the back of her right wrist. She commenced work for the appellant Company on March 22nd, and claims to have been injured on the following April 12th. She worked at refinishing old gun stocks. Her particular job was to apply the gun stocks against an electric driven sanding belt so as to remove the stains and smooth out the rough places in the wood. In order to accomplish her task it was necessary to grasp the gun stock in both hands, hold it securely against the moving belt and gradually turn it until the entire surface was sanded. The employees who did this type of work were paid on a piecework basis. The work was done at a high rate of speed. The average employee usually sanded some 700 to 800 gun stocks per working day. The sanding oper-

ation apparently required considerable manipulation of the hands and wrists.

Appellee described the events of April 12th in these words:

"Q. 9. Will you tell the Board, first, what sort of an injury is that, or was that? A. Well, it was—my wrist began swelling—

"Q. 10. (Interrupting) First, which wrist was it? A. My right wrist. It became terribly sore, oh, for 4 or 5 days. And then on the 12th of April we were pressed for work—I mean, they were pushing us quite hard and I had this successive (excessive) strain on twisting my wrist.

"Q. 14. Just tell about what happened, as near as you recollect it, and what you were doing there? A. Well, we started to work at 7:00 o'clock, and they would push these racks of gun stocks which consisted of 100 gun stocks to each rack—

"Q. 15. (Interrupting) Who did that? A. We did; we would push them up to our machine, complete them, and then push them over for the next operation. And on this particular day they were pushing them over very fast, and my hand had been sore but it began swelling that day. And I went over and I told my boss, Mr. Edelen, that my hand was so sore that I couldn't hardly do anything, and would they put me on something that wouldn't be so hard on my hand and maybe it would ease off. They told me to go to first aid down on the first floor, and I went down there and there was nobody in first aid but there were two men in a room next to it and one of them taped up my hand.

"Q. 17. Did anything in particular happen at that time to cause it to get any worse, or not? A. Well it was just this more excessive work. We were working at such excessive speed that I evidently struck it or twisted it, or something or other.

"Q. 99. And because of the weight of the stock, and the necessity of repeatedly turning your right hand to hold the proper proportion of the surface against the sand belt, the muscles in your right wrist got sore almost immediately when you began working, isn't that true? A. That is right, they became sore.

"Q. 100. And they continued to be sore for several days or a week, or more, is that right? A. That is right.

"Q. 102. And during that whole two weeks period your right wrist, or the muscles in it, had been sore from— A. (Interrupting) They had been sore, yes sir.

"Q. 103. And by the end of two weeks your wrist had taken to swelling a little, is that right? A. On April 12th I evidently jerked it or something because it began swelling up, and a lump appeared there.

"Q. 104. Well by April 12th you noticed some swelling, is that right? A. Yes, on that particular date.

"Q. 105. You don't remember hitting your wrist or doing anything particularly to it that day, do you? A. Other than just jerked it.

"Q. 106. By that do you mean that you were trying to work fast that day? A. That's right.

"Q. 108. And that is the only thing that occurred unusual that day, except that you noticed some swelling, is that right? A. Yes.

"Q. 109. When the swelling continued you went to your foreman and told him that your wrist was hurting and that you wanted to be transferred to another job, is that right? A. That is right.

"Q. 110. And that is all you told him, isn't it? A. And I told him that I wanted to go to first aid to see what they could do about it.

"Q. 136. And you did not miss any time from work from then until you quit about April 29th? A. That is right."

The medical testimony is to the effect that a cyst such as appellee has may be caused by a direct blow, or by an unusual and repeated use of the ligaments of the hand and wrist.

The decision of the Workmen's Compensation Board is based upon the finding of its Referee:

"3. That the condition of plaintiff's wrist developed gradually as a result of her performing the usual work incident to her employment as a sander of gun stocks, and did not occur suddenly or arise out of an unusual occurrence."

We think the evidence supports the finding of the Referee and that the Board's decision based on that finding is correct. Appellee has failed to connect her disability with any particular injury and it is not traceable to any definite time. Although she did not notice the cyst until the morning of April 12th, and although it may have appeared suddenly at that time, it is apparent that the cyst is merely the tangible evidence of the condition caused by the repeated use of the ligaments of the wrist over a period of weeks. No definite blow, jerk or strain to the wrist is established. It is established to the contrary that not only the appellee, but almost all new employees who did this type of work, experienced soreness in their wrists until they became accustomed to the work.

It seems to us that what was said in Great Atlantic & Pacific Tea Co. v. Sexton, 242 Ky. 266, 46 S.W.2d 87, 89, is applicable here.

"If an injury is suffered in the course of employment, unexpectedly, and without design, and can be traced to a definite time, place, and cause, it is an accident within the popular sense of that term and as it is used in the compensation laws. * * *"

In Nolley v. Diamond Coal Company, 291 Ky. 849, 165 S.W.2d 841, 843, we referred to the Sexton case and said that the award for compensation was sustained, "because the injury was traceable to a definite accident as the word is used in the compensation law, and not 'a gradual development arising out of natural dangers incident to the employment, but was sudden, unexpected, and unusual, without any of the distinctive features of an occupational disease.'"

The judgment is reversed, with directions to enter a judgment sustaining the decision of the Workmen's Compensation Board.